## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## PARKERSBURG DIVISION

| | |
|---|---|
| **VICTORIA CLINE OBO GRACE XXX,** ) | |
| **OBO CLAIMANT BERNEDA** ) | |
| **STEWART** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 6:13-23194** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| **Defendant.** ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433,

1381-1383f. By Standing Order entered September 24, 2013 (Document No. 4.), this case was

referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence,

and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28

U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for

Judgment on the Pleadings (Document Nos. 14 and 15.) and Plaintiff's Reply. (Document No. 16.)

The Plaintiff, Berneda Stewart (hereinafter referred to as "Claimant"), filed applications for

DIB and SSI on October 28, 2010 (protective filing date), alleging disability as of March 23, 2006,

due to bipolar I disorder, depression, seizures, and chronic mental illness.[1] (Tr. at 18, 129, 132, 139,

---

[1] Claimant filed prior applications for DIB and SSI on November 11, 2003, alleging
disability on October 3, 2003. (Tr. at 13.) Her claims were denied initially on February 20, 2004.
(*Id.*) Claimant filed further applications for DIB and SSI on May 22, 2006, alleging disability on
March 23, 2006. (*Id.*) The claims were denied initially and upon reconsideration. (*Id.*) Claimant did
not seek further review. Claimant filed another application for DIB and SSI on February 27, 2008,
alleging disability on March 23, 2006. (*Id.*) The claims were denied initially and upon
reconsideration. (*Id.*) A hearing was held by an ALJ, and an unfavorable decision was issued on

145, 660-66, 667.)  The claims were denied initially and upon reconsideration. (Tr. at 50-52, 57-59,

667-69, 672, 675-77, 678.) On July 22, 2011, Claimant requested a hearing before an Administrative

Law Judge (ALJ). (Tr. at 18, 61-62, 679-80.) A hearing was held on October 9, 2012, before the

Honorable William R. Paxton. (Tr. at 684-706.)  By decision dated October 22, 2012, the ALJ

determined that Claimant was not entitled to benefits. (Tr. at 18-30.) The ALJ's decision became

the final decision of the Commissioner on July 30, 2013, when the Appeals Council denied

Claimant's request for review. (Tr. at 6-10.) Claimant filed the present action seeking judicial review

of the administrative decision on September 18, 2013, pursuant to 42 U.S.C. § 405(g). (Document

No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable impairment which can be expected to last for a continuous period of not less

than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled"

at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under

the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the

---

November 6, 2009. (*Id.*)

claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) Rating the degree of functional limitation. (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent

3

to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, March 23, 2006. (Tr. at 21, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "schizoaffective disorder/depressed type, alcohol dependence, and a history of marijuana abuse," which were severe impairments. (Tr. at 21, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following nonexertional limitations:

5

> [T]he [C]laimant is limited to understanding, remembering, and carrying out simple instructions. The [C]laimant is limited to work without specific production quotas or a rapid pace. She must have no interaction with the public and only occasional interaction with coworkers and supervisors. The [C]laimant needs to work in a stable environment where changes to the routine work setting would be explained to her.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 28, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker, at the unskilled, medium level of exertion, and as a cleaner/housekeeper and a price marker, at the unskilled, light level of exertion. (Tr. at 28-29, Finding No. 10.) On this basis, benefits were denied. (Tr. at 29, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

6

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 7, 1975, and was 36 years old at the time of the administrative hearing, October 9, 2012. (Tr. at 28, 660, 690.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 28, 131, 133, 690.) In the past, she worked as a cashier/checker and a daycare worker. (Tr. at 28, 133-34, 169, 691-92, 701.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and discusses it herein in relation to Claimant's arguments.

On July 6, 2007, Elizabeth Stubbe, M.A., ABD, conducted a psychological evaluation, on the referral of Child Protection Services ("CPS") when Claimant tested positive for marijuana on the birth of her daughter. (Tr. at 180-84, 203-07.) Claimant reported an extensive history of cannabis use and that beginning at age 25, she began using a couple times a week until last year when she began using daily. (Tr. at 181, 204.) Her last use was on June 11, 2007, and she did not know it was harmful to her unborn child. (Id.) She reported withdrawal symptoms of anxiety and irritability. (Id.) Ms. Stubbe noted that Claimant initiated treatment on June 19, 2007, for substance abuse evaluation, at which time she had paranoid delusions, auditory hallucinations, and spoke to herself under her breath. (Id.) She was disoriented, depressed, confused, had memory impairment, and reported that she hated her life but did not have a specific plan to commit suicide. (Id.) She had told her CPS worker that God was the father of her baby and was confused at their meeting. (Id.) Claimant had denied the need for treatment and indicated that she just needed friends. (Id.)

On mental status examination, Claimant had low energy level and indicated that she was somewhat dysphoric and had a blunted affect. (Tr. at 181, 204.) Claimant reported that she was anxious and felt irritable at times due to her involvement with CPS. (Tr. at 181-82, 204-05.) Claimant denied suicidal or homicidal ideation but admitted an attempt at age 15 by cutting herself and again at age 19 by overdose. (Tr. at 182, 205.) Claimant had symptoms of paranoia, made good eye contact and was appropriate socially, exhibited relevant and coherent speech, was oriented in all spheres, denied any delusions, had adequate social judgment and unimpaired memory functions, had adequate motivation and concentration and maintained good persistence, but had retarded psychomotor activity and an IQ that fell within the low average range of intellectual functioning. (Id.) Results of the WAIS-III revealed a Verbal IQ of 91, a Performance IQ of 83, and a Full Scale IQ of 87. (Id.) Ms. Stubbe diagnosed cannabis abuse; schizoaffective disorder, depressive type; and assessed a GAF of 50.[3] (Tr. at 184, 207.)

On July 25, 2007, Cindy Dugan, M.D., a Psychiatrist, conducted an Initial Psychiatric Evaluation of Claimant. (Tr. at 201-02.) Dr. Dugan noted that because marijuana was found in the tox screen of Claimant's baby, she was removed for 30 days from Claimant's care and was then placed in the custody of the maternal grandmother. (Tr. at 201.) Claimant reported depression, avolition, anhedonia, decreased energy and memory, decreased concentration and attention, negativism, helplessness, hopelessness, uselessness, worthlessness, and guilt, but good sleep and appetite. (Id.) She denied suicidal and homicidal ideations but was somewhat paranoid about the CPS case. (Id.) On mental status exam Claimant was somewhat defensive and upset, had decreased

---

[3] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has serious symptoms, or serious impairment in social, occupational or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

psychomotor activity and eye contact, and had a dysphoric mood and labile affect. (Tr. at 201.) Claimant otherwise was talkative, presented concrete ideas, was aware of herself and her surroundings, had an average memory, had good judgment and fair insight, had average concentration and attention, had good reality testing, and had a good fund of knowledge. (Id.) Dr. Dugan diagnosed marijuana abuse and rule out major depression, and assessed a GAF of 65.[4] (Id.) Claimant declined medication. (Id.)

Claimant returned to Dr. Dugan and Amanda Flesher, P.A., on February 28, 2008, after having been discharged from the Crisis Unit at Westbrook for polysubstance abuse treatment. (Tr. at 24, 200, 481.) Claimant reported that she felt much better and denied any symptoms of depression or anxiety and reported that she was neither suicidal nor homicidal. (Id.) She reported that she had been taking her medications as prescribed and believed that they were working well for her. (Id.) Claimant was taking Cymbalta, Seroquel, and Nexium. (Id.) On mental status exam Claimant maintained good eye contact, had a good mood and her affect was appropriate to her mood, psychomotor activity was within normal limits, she was talkative, had no hallucinations or paranoia, and had good judgment, insight, and reality testing. (Id.) Dr. Dugan noted that Claimant was stable and continued her medications. (Id.)

On April 24, 2008, Claimant presented to Camden Clark Memorial Hospital and requested inpatient treatment for alcohol and drug abuse. (Tr. at 24, 513.) She reported that she smoked marijuana and drank whiskey daily. (Id.) Claimant was discharged and advised to follow up with Westbrook stabilization unit the following morning. (Id.) Claimant returned to Westbrook on August

---

[4] A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

4, 2008, after having been discharged from Highland Hospital because she wanted help with her drinking. (Tr. at 24, 198.) Claimant reported that she was prescribed medications that caused her to have "no cravings for alcohol." (Id.) On mental status examination, Claimant maintained good eye contact, had good mood and appropriate affect, was talkative, had no loosening of association or flight of ideas, denied suicidal or homicidal ideation, denied hallucinations or paranoia, and had good insight, judgment, and reality testing. (Id.) Ms. Flesher noted that Claimant was stable and continued her medications. (Id.)

On July 6, 2008, Dr. Lily Jacob, M.D., a staff physician at Westbrook, saw Claimant on her complaints of social anxiety and alcohol addiction. (Tr. at 474-75.) On mental status examination, Dr. Jacob noted that Claimant was mildly disheveled but fully was oriented, had a depressed mood and somewhat agitated affect, denied suicidal and homicidal ideations, had adequate judgment, presented with normal speech, maintained good eye contact, and had no looseness of associations or flight of ideas. (Tr. at 475.) However, her memory was impaired, her insight was moderately impaired, and her sociability was slightly guarded. (Id.) Dr. Jacob diagnosed bipolar disorder NOS, alcohol and marijuana dependence, and assessed a GAF of only 42.[5] (Id.) She adjusted Claimant's medications and recommended group therapy. (Id.)

On August 18, 2008, Claimant reported that she stopped her Antabuse and Naltrexone and drank, but resumed her medications. (Tr. at 197, 478.) She denied any symptoms of depression or anxiety, and her mental status exam was unremarkable. (Id.) Ms. Flesher again noted that Claimant was stable and continued her medications. (Id.) Claimant failed to appear for an appointment on

---

[5] A GAF of 41-50 indicates that the person has some serious symptoms "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

September 17, 2008, for a comprehensive psychiatric assessment, and on September 22, 2008, Dr. Amelia McPeak, D.O., a Psychiatrist at Westbrook, found that Claimant was stable. (Tr. at 24, 195, 477.) Dr. McPeak noted that Claimant's mood and anxiety symptoms were stable and that she had no cravings for alcohol. (Id.) On examination, Dr. McPeak observed that Claimant had poor eye contact, was mildly anxious and dysphoric, and had a constricted affect, but denied suicidal or homicidal ideation, had intact attention and concentration, had limited insight and judgment, and had linear and goal-directed thought processes. (Id.)

Despite Dr. McPeak's finding that Claimant was stable, Claimant was admitted to William R. Sharpe, Jr., Hospital from October 15 to 21, 2008, with a long history of alcohol dependence and a labile mood, and was admitted for psychiatric evaluation and treatment. (Tr. at 24, 404-05.) On admission, Claimant was assessed a GAF of 60[6] and on discharge, she was assessed with a GAF of 75.[7] (Tr. at 24, 404.) Claimant was discharged on October 21, 2008, and transferred to the John Good Center. (Tr. at 24, 405.)

Claimant cancelled her appointment at Westbrook on October 22, 2008, and failed to appear for her appointment scheduled on November 3, 2008. (Tr. at 24, 193-94.) Claimant returned to Westbrook on January 5, 2009, and reported that she had been more compliant with her medications and that she was motivated to take her medications. (Tr. at 24, 192, 476.) She reported sleep difficulties. (Id.) Ms. Flesher explained that she had been non-complaint with medical appointments

---

[6] A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

[7] A GAF of 71-80 indicates that if the person has symptoms, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument) and result in no more than a slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

and needed to see the doctor. (Id.) Ms. Flesher observed on mental status exam that Claimant had normal psychomotor activity, fair eye contact, fair mood, appropriate affect, talkative speech, no looseness of associations or flight of ideas, good insight and judgment, good reality testing, and that she denied suicidal or homicidal ideations. (Id.) Ms. Flesher advised Claimant to continue the Paxil and Ativan to help with the depression and anxiety. (Id.)

On January 9, 2009, Dr. McPeak indicated that Claimant had been consistently non-compliant with appointments and was for walk-in only. (Tr. at 24, 191.) She noted that Claimant's mood and anxiety symptoms were fairly stable though she had experienced a lot of panic attacks. (Id.) Dr. McPeak further noted that Claimant tolerated medications well without side effects. (Id.) On mental status exam, Claimant presented with poor eye contact, was mildly anxious, had a constricted affect, and had limited judgment and insight, but otherwise had linear and direct thought processes, intact attention and concentration, and denied suicidal or homicidal ideations. (Id.) Dr. McPeak adjusted Claimant's medications. (Id.)

Claimant was admitted to Camden-Clark Memorial Hospital on January 16, 2009, for a reported possible accidental overdose of prescription medications. (Tr. at 24, 226-29.) Claimant reported that she was missing two days' worth of medication but did not recall taking more than she was prescribed. (Id.) She denied any intentional overdose. (Id.) On exam, Claimant was alert, oriented, and cooperative, she was depressed with a flat affect, she denied delusions or hallucinations, and she was suicidal but denied plan. (Tr. at 24, 228. ) Claimant was treated and discharged against medical advice on February 3, 2009. (Tr. at 24, 244.) On discharge, she was diagnosed with psychotic disorder NOS, rule out schizoaffective disorder versus schizophrenia,

alcohol and cannabis dependence, and was assessed a GAF of 40.[8] (Id.)

Claimant returned to Westbrook on February 11, 2009, extremely intoxicated. (Tr. at 24, 190.) Dr. McPeak cancelled her appointment and had Claimant taken to the crisis team for evaluation. (Id.) Claimant again was admitted to Camden-Clark Memorial Hospital on February 14, 2009, for complaints of alcohol abuse and depression. (Tr. at 24, 250-53, 431-36.) On examination, Claimant was alert and oriented, but was anxious, depressed, and animated. (Tr. at 24, 251.) She denied suicidal or homicidal ideation. (Id.) During treatment, Claimant reported that her life was without purpose since her children were taken by CPS. (Tr. at 408.) She reported much social anxiety and indicated that she was unable to function around people. (Id.) Claimant was discharged on February 22, 2009, and reported that she felt better and was doing well. (Id.) She was assessed a GAF of 60-65. (Tr. at 24, 407.) Claimant requested long-term rehabilitation, but was restarted on medications. (Id.)

On April 8, 2009, Dr. H. Hoback Clark, M.D., completed a form Mental Disability/Incapacity Evaluation for the West Virginia Department of Health and Human Resources ("DHHR"). (Tr. at 27, 466-67.)  Dr. Clark opined that Claimant was mentally disabled and had a medically determinable impairment or combination of impairments that significantly limited her ability to perform basic work activity. (Id.)

Claimant was admitted to Chestnut Ridge Hospital involuntarily by her husband on July 26, 2009, for alcohol detoxification.[9] (Tr. at 24-25, 294-98, 410-16.) Claimant had been drinking two

---

[8] A GAF of 31-40 indicates that the person has some impairment in reality testing or communication or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

[9] On April 6, 2009, Claimant was found in the ditch alongside the road, intoxicated, and taken to Camden-Clark Memorial Hospital for evaluation. (Tr. at 275-76.) Although belligerent,

pints of whisky and vodka daily and her last drink was a gallon of vodka. (Tr. at 24-25, 410.) At admission, Claimant was alert and oriented with good attention span, she maintained fair eye contact, she had intact memory, had a depressed mood and congruent affect, thought processes were linear and goal directed, fund of knowledge was average, she denied suicidal or homicidal ideations and hallucinations, and she had poor insight and judgment. (Tr. at 412.) Claimant was assessed with a GAF of 40. (Tr. at 413.) Claimant was discharged on August 2, 2009, with an assessed GAF of 55-60. (Tr. at 414.) She was instructed to follow-up with Dr. McPeak. (Tr. at 25, 415.)

Claimant returned to Dr. McPeak on September 30, 2009, and reported that she had been clean and sober for several weeks. (Tr. at 25, 189.) Dr. McPeak noted that Claimant was motivated to remain clean and sober, and denied any significance of severe depression or anxiety, and tolerated medications well without side effects. (Id.) On mental status examination, Claimant presented with normal behavior and speech, had a mildly anxious mood and constricted affect, but had linear and goal-directed thought processes, intact associations, intact attention and concentration, fair insight and judgment, and denied suicidal or homicidal ideations and hallucinations. (Id.) Dr. McPeak noted that Claimant was stable on medications. (Id.)

On January 11, 2010, Claimant returned to Camden-Clark Memorial Hospital and was treated for alcohol abuse and intoxication. (Tr. at 25, 317-20.) On August 11, 2010, Claimant returned to the emergency room for alcohol withdrawal. (Tr. at 25, 330-33.) She reported that she had stopped drinking for three days and then resumed drinking that day. (Tr. at 25, 330.) Although she denied symptoms of anxiety, headaches, palpitations, sweats, or hallucinations, Claimant requested to be admitted for rehabilitation. (Id.) She also reported problems with depression but stated she did not take her medications due to the way they made her feel. (Id.) She also reported

---

Claimant was discharged home to the care of her husband. (Tr. at 276.)

that she no longer followed up with anyone for her mental health issues. (Id.) Claimant was involuntarily admitted on January 11, 2011, after her husband filed a petition and she was presented to the emergency room for a mental hygiene. (Tr. at 25, 595-99, 601.) Claimant smelled of alcohol and appeared distressed and uncomfortable. (Tr. at 25, 597.) She was discharged on January 12, 2011, in stable condition. (Tr. at 25, 595, 601.) Claimant returned to the ER on July 17, 2011, and requested a psychiatric evaluation due to increased alcohol consumption. (Tr. at 25, 600, 602-05.) Claimant reported that she felt sad and hopeless and consumed one gallon of vodka daily. (Tr. at 25, 603.) She reported that she had been depressed since her husband's death on June 15. (Tr. at 25, 604.) She was discharged on July 18, 2011, in stable condition, with instructions to follow-up at Westbrook. (Tr. at 25, 604-05.)

On September 13, 2011, Dr. McPeak completed a comprehensive psychiatric assessment due to worsening of problems with depression since her husband's death and re-commitment to sobriety off of alcohol and a desire to resume treatment for her mental issues. (Tr. at 25, 399-402, 450-53.) Claimant was cooperative, had a dysphoric and anxious mood with a constricted affect, presented with normal speech and linear and goal-directed thought processes, she denied suicidal or homicidal ideations, she admitted to occasional auditory hallucinations, her attention and concentration were intact, her fund of knowledge was average, and her insight and judgment were limited. (Tr. at 25, 401, 452.) Dr. McPeak assessed schizoaffective disorder, depressed type; rule out PTSD; and assessed a GAF of 55. (Id.) She opined that it was likely that Claimant struggled with an underlying severe mental illness. (Id.) She recommended continued aggressive individual therapy to maintain sobriety and continued Claimant on her medications. (Id.) She opined that Claimant's condition was guarded due to her recurrent non-compliance with treatment and history of recurrent substance abuse. (Id.)

15

On November 9, 2011, Darby Stevens, M.A., a Licensed Professional Counselor at Westbrook, wrote a letter in an effort to assist Claimant in obtaining disability benefits. (Tr. at 25, 398.) Ms. Stevens indicated that she had worked with Claimant for over ten years as a therapist and case manager and that it had been difficult to track Claimant's information as she had experienced delusions and auditory hallucinations. (Id.) Ms. Darby reported that Claimant suffered from schizoaffective disorder and alcohol dependence, was unable to manage her own money, and did not have stable housing. (Id.) On January 8, 2012, Lilly Jacob, M.D., another Psychiatrist at Westbrook, completed a form Psychiatrist's Summary for the West Virginia DHHR and opined that Claimant was disabled for life. (Tr. at 27, 465.) Dr. Jacob opined that Claimant suffered from schizoaffective disorder, PTSD, depression, anxiety, and alcohol and substance abuse, which caused her to be unable to maintain any type of employment. (Id.) Due to her non-compliance with treatment, Dr. Jacob opined that her prognosis was poor. (Id.)

On March 13, 2012, Dr. McPeak noted that Claimant was discharged from the crisis unit at Westbrook on March 7, 2012, and had been doing better on medications. (Tr. at 25, 437.) She continued to experience auditory hallucinations, sleep difficulties, and some depression. (Id.) On examination, she denied suicidal or homicidal ideation, was cooperative, had normal speech and thought content, had intact attention and concentration, and had fair insight and judgment, but her mood was depressed slightly and her affect was constricted. (Tr. at 25, 438.) Dr. McPeak adjusted Claimant's medications. (Id.) On April 11, 2012, it was noted that Claimant was doing well on medications. (Tr. at 25, 440-41.) She had an euthymic mood and a full and appropriate affect. (Tr. at 25, 441.) She denied hallucinations and suicidal or homicidal ideations. (Id.) She was found psychiatrically stable on medications. (Id.)

On April 18, 2012, however, Claimant reported to St. Joseph's Hospital with complaints of

depression and suicidal thoughts. (Tr. at 25-26, 444-45.) Claimant reported that she had been drinking and not taking her medications. (Tr. at 445.) On August 28, 2012, Loretta Auvil, M.D., completed a form Physician's Summary for the West Virginia DHHR. (Tr. at 27, 457.) Dr. Auvil opined that Claimant's bipolar disorder, schizophrenia, depression, and alcohol abuse rendered her disabled for life. (Id.) She further opined that Claimant's prognosis was fair. (Id.) Dr. Auvil also completed on that date a form General Physical (Adults), on which she opined that Claimant's disability would last for only one year. (Tr. at 27, 454-56.)

Subsequent to the hearing, Darby Stevens, M.A., completed on October 12, 2012, a form Mental Impairment Questionnaire - Adult. (Tr. at 26-27, 635-44.) Ms. Stevens indicated that she had worked with Claimant for six years and assessed her with schizoaffective disorder, depressed type; history of PTSD; alcohol dependence; and social isolation. (Tr. at 26, 635.) She assessed a then current GAF of 49. (Id.) Ms. Stevens opined that Claimant had marked restriction of activities of daily living and difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation. (Tr. at 26-27, 639.) She indicated that Claimant would miss more than four days of work per month as a result of her mental impairments and that her disability was expected to last at least one year. (Tr. at 27. 640.) She further opined that Claimant had multiple moderate and marked limitations in various functional categories. (Tr. at 27, 641-43.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed properly to evaluate and weigh the medical opinions of record and erred when he based the RFC finding on his own lay opinion rather than the medical opinions contained in the record. (Document No. 14 at 8-12.) Claimant asserts that the ALJ failed to consider all the

evidence of record, failed to give good reasons for discrediting the opinions of her treating therapist and other medical sources, and improperly substituted his opinion for those of qualified medical sources. (Id. at 9.) Specifically, Claimant cites to the opinions of Ms. Stevens and Drs. Clark, Jacob, and Auvil, and alleges that the ALJ erred in not according any weight to the opinions of her medical sources. (Id. at 10-11.) Consequently, Claimant asserts that the ALJ's RFC finding and step five finding are unsupported by the substantial evidence of record. (Id. at 11.)

In response, the Commissioner notes that Claimant passed away on July 9, 2013. (Document No. 15 at 3.) As a result of her death, the Commissioner asserts that Claimant's SSI claim extinguished upon her death because no qualifying individual exists to receive benefits on Claimant's behalf. (Id. at 11.) The Commissioner asserts that Claimant's spouse passed away on June 15, 2011, and therefore, pursuant to 42 U.S.C. § 1383(b)(1)(A)(i), there is no qualifying individual to receive SSI benefits on Claimant's behalf. (Id.) Regarding Claimant's DIB claim, the Commissioner notes Claimant's assertions that the ALJ erred in assigning weight to the medical opinions, but asserts that Claimant failed to offer any explanation, evidence, or analysis to support her assertions. (Id. at 14-15.) Respecting Drs. Clark, Jacob, and Auvil and Ms. Stevens' opinions, the Commissioner asserts that the ALJ properly concluded that their opinions were unsupported and inconsistent with the other evidence of record. (Id. at 15.) The Commissioner cites to various mental status examinations wherein Claimant had essentially normal exams. (Id.) Additionally, the Commissioner notes that Claimant's medications were working, that she often was non-compliant with appointments, and that she reported having felt better. (Id. at 15-16.) The Commissioner asserts that Drs. Jacob and Auvil's opinions were on an issue reserved to the Commissioner; Dr Clark opined that Claimant had significant work-related limitations but failed to identify them; and Ms.

Stevens, a therapist, was not an acceptable medical source. (<u>Id.</u> at 16.) Consequently, the Commissioner asserts that the ALJ reasonably evaluated the medical opinion evidence of record. (<u>Id.</u>)

In reply, Claimant asserts that all the opinions rejected by the ALJ, except the state agency consultants' opinions, were consistent with one another, and therefore, were only inconsistent with the ALJ. (Document No. 16 at 2.) Claimant asserts that the ALJ rejected every medical opinion in the record, and therefore, his RFC assessment is not based on sufficient evidence. (<u>Id.</u>) She asserts that the ALJ improperly played the dual roles of medical expert and adjudicator. (Id. at 2-3.)

<u>Analysis</u>.

1. <u>SSI Claim</u>.

The Commissioner requests that the Court dismiss Claimant's Motion with prejudice as it relates to her SSI claim as the claim was extinguished upon Claimant's death. (Document No. 15 at 11-12.) Pursuant to 42 U.S.C. § 1383(b)(1)(A)(i), SSI benefits owed to a deceased claimant shall be payable to a surviving spouse of the claimant if the spouse was living in the same household at the time of claimant's death or within the six months immediately preceding the month of the death. <u>See also</u>, 20 C.F.R. § 416.542(b)(1) (2012). Claimant's husband passed away on June 15, 2011, and therefore, did not survive her. In the case of a disabled or blind child, benefits may also be payable to a parent, if the child was living with the parent at the time of his death or within the six months immediately preceding the death. 42 U.S.C. § 1383(b)(1)(A)(ii); 20 C.F.R. § 416.542(b)(2) (2012). Claimant was born in 1975, and therefore, was not a minor child when she passed away. Claimant's children do not qualify to receive benefits because 20 C.F.R. § 416.542(b)(4) prohibits payments

to anyone other than a qualifying surviving spouse or qualifying parent.[10] Accordingly, the undersigned finds that Claimant's Motion respecting her SSI claim must be dismissed with prejudice.

2. Opinion Evidence.

Claimant alleges that the ALJ erred in evaluating the opinions of Ms. Stevens and Drs. Clark, Jacob, and Auvil. (Document No. 14 at 8-12.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2012). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and

---

[10] Title 20 C.F.R. § 416.542(b)(4) provides:

No benefits may be paid to the estate of any underpaid recipient, the estate of the surviving spouse, the estate of a parent, or to any survivor other than those listed in paragraphs (b)(1) through (3) of this section.

laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2012). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling

weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ gave no weight to the opinions of Ms. Stevens of October 12, 2012, because as a therapist, she was not an acceptable medical source. (Tr. at 27.) The ALJ further found that her opinions were too extreme and unsupported by the medical record and her own reports, in which she stated that Claimant had problems with medication compliance that was related to the nature of her illness. (Id.) The Regulations require that ALJs consider all evidence from "acceptable medical sources" including licensed physicians and other providers. 20 C.F.R §§ 404.1513(a), 416.913(a). In addition to evidence from acceptable medical sources, the Regulations allow ALJs to "use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R §§ 404.1513(a), 416.913(a) (2012). Licensed professional counselors are not "accepted medical sources" but qualify as "other sources" under 20 C.F.R. § 404.1513(d) and § 416.913(d). See SSR 06-03p, 2006 WL 2329939 *2. The rules for evaluating acceptable medical source statements and opinions do not apply, therefore, to statements and opinions of licensed professional counselors. ALJs may consider any opinions of counselors as additional evidence, but they are not required to assign them weight, controlling or otherwise, in their evaluations of evidence. In some instances however, "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03p, 2006 WL 2329939 *5. Although Ms. Stevens indicated in her letters that she had worked with Claimant for over ten years as a therapist, the evidence of record contained only her two opinions. Her opinions therefore, cannot be explained further by her treatment notes. The undersigned therefore finds that the ALJ's finding regarding Ms. Stevens is supported by substantial evidence. Any error the ALJ may have committed in not

assigning weight to Ms. Stevens' opinion dated November 9, 2011, is harmless.

The ALJ also gave no weight to Dr. Clark's April 8, 2009, opinion that Claimant had a medically determinable impairment that significantly limited her ability to perform basic work activity because the opinion was vague and unsupported by any objective findings. (Tr. at 27.) The ALJ noted that Dr. Clark failed to identify any actual restrictions. (Id.) Respecting Dr. Jacob's opinions that Claimant was disabled for life and had a poor prognosis due to a history of noncompliance with treatment, the ALJ gave her opinions no weight because records from Westbrook indicated that Claimant was stable when she was compliant with treatment, which conflicted with Dr. Jacob's opinions. (Id.) Finally, the ALJ accorded no weight to Dr. Auvil's opinions that Claimant was unable to work for life due to her mental condition and alcoholism, and had a fair prognosis, because the two opinions were contradictory and unsupported by objective findings. (Tr. at 27.) The other opinion evidence of record concluded that the evidence of record was insufficient and that Claimant had no severe mental impairment. (Tr. at 27-28.) The ALJ likewise accorded no weight to these opinions because he found that Claimant did have a severe mental impairment. (Id.) The ALJ therefore, rejected all the opinion evidence of record, yet rendered an RFC that Claimant was limited to understanding, remembering, and carrying out simple instructions; limited to work without specific production quotas or a rapid pace; must have no interaction with the public and only occasional interaction with coworkers and supervisors; and needs to work in a stable work environment where changes to the routine work setting would be explained to her. (Tr. at 22.)

In reaching this conclusion, the ALJ determined that Claimant was limited moderately in her ability to maintain activities of daily living, social functioning, concentration, persistence, and pace, and had no episodes of decompensation. (Tr. at 21-22.) The ALJ noted Claimant's reports of social

23

anxiety, thereby supporting the ALJ's limitation with the public, coworkers, and supervisors. (Tr. 21.) The ALJ also noted Ms. Stubbe's indication of impaired attention and concentration, despite treatment records demonstrating that these activities were intact. (Tr. at 22.) Nevertheless, the ALJ limited Claimant to working in a routine setting with simple instructions without quotas or a rapid pace. As the evidence above demonstrates, Claimant's various mental status exams essentially were unremarkable for significant findings. The various providers at Westbrook consistently noted that Claimant was stable on medications, and when she took her medications for substance abuse, she had no cravings for alcohol.

The ALJ appropriately rejected the opinions of Drs. Clark, Jacob, and Auvil. Dr. Clark merely opined that Claimant had a medically determinable impairment that significantly limited her ability to work, but offered no explanation or objective evidence in support of her opinion. As the ALJ concluded, her opinion was vague. Drs. Jacob and Auvil both opined that Claimant was disabled for life, an opinion as the Commissioner notes, is reserved to the Commissioner. See 20 C.F.R. § 404.1527(d)(1), (3) (2012). Moreover, Dr. Auvil offered no objective evidence in support of her opinion.

In view of the foregoing, the undersigned finds that the ALJ properly based his RFC assessment on Claimant's subjective reports, the objective medical evidence, and the evidence of the examining physicians. The ALJ was not required to obtain an expert medical opinion or a further opinion as to Claimant's RFC. See Felton-Miller v. Astrue, 459 Fed.Appx., 226, 231 (4th Cir. 2011).

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 14.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 15.), **AFFIRM** the final decision of the

Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 19, 2015.

R. Clarke VanDervort
United States Magistrate Judge